# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DANNY RAY SAMPSON,

         *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.

_____/

Civil Action No. 16-cv-02256
JUDGE ALETA A. TRAUGER
MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 12)

## I.    REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Danny Ray Sampson's claim for Supplemental Security Income benefits ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1383f. (Tr. 129–34). Pursuant to Administrative Order No. 24, entered on January 13, 2018, and 28 U.S.C. § 636, subsections (a), (b), and (c), this case has been assigned to the undersigned Magistrate Judge. The matter is currently before the court on Plaintiff's motion for summary judgment. (Doc. 12).

Plaintiff was born on December 30, 1969, making him 42 years old on his alleged disability onset date of November 18, 2012. (Doc. 13 at ID 448). He filed his application for SSI on November 19, 2012. (Tr. 10). His application was denied on February 25, 2013. (Tr. 78–80). On March 12, 2013, Plaintiff filed a request for reconsideration, (Tr.

1

85-86), and on June 5, 2013, the Commissioner confirmed that the previous denial of his claim was proper under the law. (Tr. 88–89). Plaintiff filed a timely Request for Hearing on June 27, 2013. (Tr. 92). The hearing was held on November 16, 2014, before Administrative Law Judge ("ALJ") Alfred M. Smith, Jr.; Vocational Expert ("VE") Charles Wheeler and Plaintiff both testified at the hearing. (Tr. 23–50). On January 20, 2015, the ALJ issued a decision denying Plaintiff's claim. (Tr. 7–22). Plaintiff submitted a request for review to the Appeals Council, (Tr. 84–87), which the Appeals Council denied on June 15, 2016. (Tr. 1–6). This action followed.

**B. Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide

questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and

meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been under a disability since he filed his application on November 19, 2012. (Tr. 7–22). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 12). At Step Two, he found Plaintiff had the following severe impairments: loss of visual acuity, chronic obstructive pulmonary disease, hypertension, and degenerative disc disease. (*Id.*). At Step Three, he concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 13). Next, the ALJ determined Plaintiff had the residual functional capacity ("RFC") to

> perform medium work as defined in 20 CFR 416.967(c) that is limited to lifting and carrying fifty pounds occasionally and twenty-five pounds frequently; standing and walking for six hours in an eight-hour workday; sitting for six hours in an eight-hour workday; no work requiring good far visual acuity or depth perception; and no more than frequent exposure to pulmonary irritants, moving mechanical parts, or high exposed places.

(Tr. 13).

Because the ALJ found Plaintiff capable of performing past relevant work as an assembler, he ended his analysis at Step Four. (Tr. 18).

**E. Administrative Record**

**1. Medical Evidence**

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

5

## 2. Application Reports and Administrative Hearing

### a. Plaintiff's Function Report

Plaintiff completed a function report on January 13, 2013. (Tr. 153–60). He reported that he lived with his girlfriend in a duplex. (Tr. 153). On a regular day, he got up, drank coffee and watched the news, "sat around" until noon, took a nap, watched TV, fed the cat, made and ate dinner, and then went to bed. (Tr. 154). He had difficulty sleeping on his back or right side so he sometimes would "toss and turn," but he reported his medication was helping him sleep better. (*Id.*).

He had no issues dressing, bathing, caring for his hair, shaving, feeding himself, or using the toilet. (*Id.*). He was able to prepare his own meals daily, such as sandwiches, TV dinners, burgers, and eggs, "just simple quick meals" due to financial constraints. (Tr. 155). It took "not long." (*Id.*). Once or twice a day, he went outside to get fresh air. (Tr. 156). He was able to drive. (*Id.*). He could shop in the grocery store for about half an hour. (*Id.*). Around the house, he was also able to do the laundry, wash dishes, clean the cat's litter box, and make the bed. (Tr. 154). By Plaintiff's estimate, the laundry took five minutes and the dishes two. (*Id.*). He and his girlfriend did chores together so the work went faster. (Tr. 155).

His conditions affected the following of his abilities: lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. (Tr. 158). According to Plaintiff's estimate, he could walk a couple of blocks before needing to catch his breath and return home. (*Id.*).

Before onset, he had been "able to work and enjoy life," fish, and go on long walks. (Tr. 154). Now, fishing "turned to be to[o] much of a hassle" so now he just watched TV and went on the computer "a little bit." (Tr. 157). Working made his lower back ache, and by the time he got home, "every joint in [his] body and [his] lower back would be stiff to where [he] could hardly walk." (Tr. 153). "[D]oing little things around the house" for half an hour would make his body ache for the rest of the day, and even "sitting and standing for a period of time" caused him pain. (*Id.*). In the past year, he had found himself "unable to finish any task without hurting the rest of the day." (Tr. 158). He found it "really stressful[] and depressing" being unable to work and to do the activities he used to. (Tr. 160). For relief, he wore a back brace at times and took hydrocodone, morphine, baclofen, and promethazine, which he said had the side effects of making him feel drowsy and tired. (Tr. 159–60).

### b. Plaintiff's Testimony at the Administrative Hearing

On November 6, 2014, an administrative hearing was held in Plaintiff's case, (Tr. 23–50), at which Plaintiff testified, (Tr. 27–43). Plaintiff reported his highest level of education was the eighth grade. (Tr. 27, 29). In the past, Plaintiff had worked at Walmart for about two years putting together bikes and toys. (Tr. 39). After Walmart, "[t]he economy crashed" and he had trouble finding work for a while. (Tr. 39). He did landscaping work with his brothers on and off for about a year, (Tr. 38), but he had "disc problems" that caused him too much pain to continue, (Tr. 30). His back "would just burn like it was on fire," and when he got home he "could hardly walk. Every joint in [his]

body was hurting." (*Id.*). He sometimes missed work or took three twenty-minute breaks to lie down on his back in a three- or four-hour work period. (Tr. 31).

Plaintiff's most recent job had been remodeling homes. (Tr. 37). He had been working in that position for two weeks when, in August 2012, he fell about fifteen feet from a ladder and landed on his side. (Tr. 29–30, 37).

At the hearing, he reported that his back continued to trouble him. It was aggravated by "standing for a long period time" or "[s]itting down for a period of time," unless he sat "just right" in his recliner. (Tr. 31). For pain relief, he sometimes stood up or lay on the floor on his back, took morphine and other pain medications, and used a heating pad. (Tr. 32). His pain medications had the side effect of causing him tiredness. (*Id.*). He testified that if he could get insurance, he would seek options besides medication to treat his pain "because it does bother [him] every day and it's annoying." (Tr. 41).

Besides his back concerns, he had also been diagnosed with chronic obstructive pulmonary disease ("COPD"). (Tr. 32). Every day he experienced coughing spells in which he "almost passed out." (Tr. 33). His breathing had "gotten pretty bad" within the past year. (Tr. 43). He smoked a pack of cigarettes every day; he had thought about quitting but found it "just tough." (Tr. 33). He had been prescribed several inhalers. (*Id.*).

At the time of the hearing, Plaintiff stated that he lived in a duplex with his girlfriend, who was disabled due to "all kinds of problems," including ankle fusions and "disc problems." (Tr. 34, 36). His girlfriend could drive, but was "kind of weird about it,"

"paranoid," and Plaintiff said he did not like riding with her. (Tr. 37). He did not have a Tennessee driver's license due to DUIs from thirteen or fourteen years ago. (Tr. 29).

About half of every day he spent in his recliner. (Tr. 35). The other half he would "get up, go to the mailbox, do dishes, fold my clothes, little things like that." (Tr. 42). Plaintiff's girlfriend did most of the household chores. (Tr. 34). He and his girlfriend went to the grocery store once a month and otherwise stayed in due to a lack of finances and Plaintiff's impairments. (Tr. 41–42).

According to Plaintiff's estimate, he could stand for about twenty minutes before needing to sit down because his back would "start[] burning a little bit," and he could walk about thirty feet before getting out of breath and needing to sit down. (*Id.*). Pain also sometimes interfered with his sleep; he caught "a couple hours here and a couple hours there." (Tr. 35). He believed it would be impossible for him to work a "sit-down job or a stand-up job . . . because the pain would just be unbearable," even with his medication. (*Id.*).

Dr. Paul Talley was his primary care doctor, who treated him for his COPD and blood pressure, and prescribed any medications besides pain medication. (Tr. 36). Plaintiff had been seeing Dr. Talley since his accident—about two years, at the time of the hearing. (Tr. 36). Dr. Talley first referred Plaintiff to Dr. Thomas O'Brien at Nashville General, but Plaintiff stopped seeing Dr. O'Brien because Plaintiff "really didn't trust him," explaining, "he thought I was lying about my MRIs." (Tr. 40-42). Next, Dr. Talley referred him to Dr. Appleton at Comprehensive Pain Specialists. (Tr. 40, 42);

9

*e.g.*, (Tr. 330). Plaintiff also saw Dr. Purdue at Affiliated Internists and Primary Care. (Tr. 40).

### c. The Vocational Expert's Testimony at the Administrative Hearing

VE Charles Wheeler also testified at the hearing. (Tr. 43–50). The VE began by classifying Plaintiff's previous work positions as construction worker ("very heavy," unskilled); yard worker (heavy, unskilled); floor cleaner (medium, semi-skilled); and assembler—lawn and garden (medium, semi-skilled). (Tr. 44–45).

The ALJ then posed his first hypothetical, asking the VE to consider

> an individual the same age, education, and vocational background as Mr. Sampson who was limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently; standing or walking six hours in an eight hour day; sitting six hours in an eight hour day. Limited to work that did not require far visual acuity or depth perception; and limited to only frequent exposure to pulmonary irritants, moving, mechanical parts, or high exposed places.

(Tr. 45). The VE responded that given those limitations, the person could perform Plaintiff's past work as an assembler, but not as a floor technician. (*Id.*).

For his second hypothetical, the ALJ asked the VE to assume

> an individual the same age, education, vocational background as Mr. Sampson who is limited to lifting and carrying 20 pounds occasionally and 25 pounds frequently; standing or walking about three hours in an eight hour day; and sitting about four hours in an eight hour day. . . . [A]ssume that the individual could work an eight hour day; and limited to only occasionally twisting, stooping, crouching, and climbing of stairs; and never climbing ladders; and limited to only frequent use of the right [dominant] hand. . . . Limited to . . . only frequent exposure to extreme cold, extreme heat, high humidity, fumes, and pulmonary irritants, and solvents and cleaners.

10

(Tr. 45–46). After Plaintiff stated he had no trouble using either of his arms or hands, the ALJ clarified that the hypothetical would include no handling or reaching restrictions. (Tr. 46–47). The VE answered that such a person could not perform Plaintiff's past work, but could perform other work such as small products assembler (17,000 jobs nationally, 500 in Tennessee); routing clerk (125,000 jobs nationally, 2,700 in Tennessee); and silver wrapper (109,000 nationally, 1,600 in Tennessee). (Tr. 47).

For his third hypothetical, the ALJ asked the VE whether work would be available if the standing and walking limitations did not add up to eight hours; the VE responded that it would not. (Tr. 47). Moving on to his fourth hypothetical, the ALJ asked the VE to assume all the same limitations in the second hypothetical but also that the person would be absent from work more than four days per month. (Tr. 47–48). Those limitations would preclude all work. (Tr. 48).

Plaintiff's attorney then posed a hypothetical with a person who "required an opportunity to lay down at unpredictable intervals at least twice a day, [thirty] minutes each time, and that's in addition to customarily allowed breaks." (*Id.*). The VE answered that all work would be precluded. (*Id.*). Plaintiff's attorney further asked how work would be affected if the hypothetical person was "unable to maintain or sustain concentration, performance, and pace for a full eight hour day due to either the effects of pain medication or pain itself." (*Id.*). In that case, too, no work would be available. (*Id.*).

Finally, the VE confirmed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except that the DOT did not cover the sit/stand option,

and there he based his testimony on his experience in the field of vocational rehabilitation and job development. (Tr. 49).

### F. Governing Law

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical

opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §

13

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

### G. Analysis

Plaintiff alleges that the ALJ erred in three ways: (1) by failing to give proper consideration to the treating source opinion evidence; (2) by failing to consider and analyze all of Plaintiff's impairments; and (3) by failing to perform a function-by-function assessment of Plaintiff's residual functional capacity.

### 1.    The ALJ's consideration of treating source opinion evidence

Plaintiff first argues that the ALJ erred in his treatment of a treating source's opinion evidence—specifically, the sole Medical Source Statement in the record. (Doc. 13 at ID 452); (Tr. 327–29). Exactly who authored the statement has been the source of some confusion. While Plaintiff and the Index identify it as an opinion from Dr. Paul Talley, (Tr. 200), Defendant suggests that it may in fact be an opinion from Dr. Travis Pardue, (Doc. 15 at ID 468). The ALJ refers to it simply as "[t]he treating source statement at Exhibit 7F." (Tr. 17–18). The statement is signed, but the signature is

14

illegible, and no printed name appears on the document, although the source identifies his employer as Metro General Hospital. (Tr. 329). Paperwork from Dr. Pardue and testimony from Plaintiff place him at Affiliated Internists and Primary Care. (Tr. 40, 251, 278). Meanwhile, records that mention Dr. Talley suggest he worked at Nashville General Hospital, although the attending physician's signature on Nashville General medical records is illegible. *See, e.g.*, (Tr. 284) (instructing patient to "return to clinic" with Dr. Talley in four to five months). Regardless, Plaintiff and Defendant agree that both Dr. Talley and Dr. Pardue are treating physicians and thus, that the issue is simply whether the ALJ properly considered the opinion as from a treating source. (Doc. 15 at ID 468); (Doc. 16 at ID 478).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Here, the treating source completed a checkbox-style form. (Tr. 327–29). The treating source marked that that Plaintiff was able to lift and carry twenty pounds on an occasional basis and twenty-five pounds on a frequent basis, to stand and walk about three hours in an eight-hour day, and to sit about four hours in an eight-hour day. (Tr. 327). Plaintiff would not need the opportunity to shift at will from sitting to standing or

15

walking, and would not need to lie down at unpredictable intervals during a work shift. (Tr. 327). The treating source estimated that Plaintiff would be absent from work more than four days per month. (Tr. 329).

Further, the treating source opined that Plaintiff could occasionally twist, stoop or bend, crouch, and climb stairs, and could never climb ladders. (Tr. 328). With his right hand, he could frequently reach, handle, finger, peel, and push or pull; with his left hand, he could occasionally reach, handle, finger, peel, and push or pull. (Tr. 328). He was to avoid concentrated exposure to extreme cold; extreme heat; high humidity; fumes, odors, dusts, and gases; perfumes; soldering fluxes; solvents or cleaners; and chemicals. (Tr. 328).

The ALJ gave "less weight" to the treating source opinion, finding it "overly restrictive" in light of (1) examination findings, (2) Plaintiff's mild pain ratings, (3) its inconsistency with Plaintiff's testimony that he has no problems with his hands and arms, and (4) its internal inconsistency in stating that Plaintiff can lift and carry twenty pounds occasionally but twenty-five pounds frequently. (Tr. 17–18).

First, the ALJ found the treating source opinion inconsistent with examination findings. (Tr. 18). For example, as the ALJ described earlier in his opinion, in November 2012, Dr. Thomas O'Brien at Nashville General Hospital explained that Plaintiff was not a surgical candidate and "strongly recommended" he discontinue the use of narcotic medication. (Tr. 229). About a year later, Dr. O'Brien again described Plaintiff as "totally" not a surgical candidate, and explained there was "no need for any additional followup in the spine clinic." (Tr. 313). He noted Plaintiff had pain with range of motion

16

testing but an otherwise normal examination, including lower extremity neurological examination. (*Id.*). He again recommended Plaintiff cease taking narcotics and, as he had a permanent progressive condition, "remain as active as possible to maintain his core strength[] and aerobic fitness level." (*Id.*).

Additionally, the consulting doctor who examined Plaintiff in February 2013 found no significant abnormalities during Plaintiffs' physical examination. (Tr. 269). He had a normal gait and was able to get out of his chair and on and off the examining table without difficulty. (Tr. 264). He lifted ten pounds with each hand. (*Id.*). All ranges of motion were within normal limits. (Tr. 266–69). And at Nashville General Hospital, Plaintiff clinic intake forms repeatedly reflected that he had "no problems" functionally. (Tr. 297, 318, 322, 326). And Plaintiff's physicians repeatedly advised him to engage in daily activities. *E.g.*, (Tr. 313, 334, 342, 351, 357, 363, 372, 380).

Second, the ALJ disregarded the opinion because it was inconsistent with Plaintiff's mild pain ratings. The ALJ noted that reports from Plaintiff's pain management provider dated August 2013 through August 2014 showed Plaintiff consistently rated his pain at two or three out of ten, (Tr. 330, 350, 356, 359, 372, 379, 386, 392, 398)—a "significant improvement" (Tr. 16) from his earlier rating of six out of ten, (Tr. 402). At his most recent appointment with his pain management provider in the record, Plaintiff reported that the medications were offering relief and improving his functioning, quality of life, and pain, and denied any adverse side effects. (Tr. 330).

At Nashville General, too, Plaintiff repeatedly reported that his pain needs were being met, (Tr. 297, 306, 318, 322), and rated his pain a zero, (Tr. 318, 326), or two out of ten, (Tr. 306), or declined to mark the pain scale at all, (Tr. 297, 322).

Third, the ALJ noted that the treating source opinion limited Plaintiff to frequent and occasional use of his hands—but the record contained no evidence that Plaintiff was so limited. In fact, as the ALJ pointed out, Plaintiff himself testified that he had no problems with his hands or his arms. (Tr. 18) (citing Tr. 46).

Fourth, the treating source opinion contained an internal inconsistency that suggested a lack of care in completing the form: it purported that Plaintiff was limited to lifting twenty pounds occasionally, but could lift twenty-five pounds frequently. (Tr. 327). *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.").

Plaintiff seeks to undermine this analysis by pointing to evidence that supports the treating source opinion, but as Plaintiff himself noted, a treating source's medical opinion must be given controlling weight only if "well-supported *and not inconsistent with the other substantial evidence in the case record.*" SSR 96-2p (emphasis added). That is to say, it does not avail Plaintiff to argue that the opinion finds some support in the record where it is also inconsistent with substantial evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would

18

decide the matter differently and even if substantial evidence also supports the opposite conclusion.").

Next, Plaintiff accuses the ALJ of not addressing the factors that an ALJ must consider when not according "controlling weight" to a treating source opinion: namely, the length of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; and the specialization of the treating source. (Doc. 16 at ID 480) (citing 20 C.F.R. § § 404.1527(d), 416.927(d)). But as discussed above, the ALJ explicitly considered the supportability of the opinion and its consistency—or here, inconsistency—with the record as a whole. Further, the ALJ discussed in some detail Plaintiff's courses of treatment with Dr. Pardue and at Nashville General Hospital (presumably with Dr. Talley), at least so far as they appear in the record. (Tr. 14–16).

The question may arise, then—though neither party raises it—whether the ALJ could have properly considered the length of the treatment relationship and specialization of the treating source if the ALJ were unsure which source authored the relevant statement. There is some cause to wonder, as the ALJ in his decision refers only to "[t]he treating source statement at Exhibit 7F," (Tr. 18), and the Commissioner's own brief admits that the Commissioner "cannot state definitely which doctor signed this form." (Doc. 15 at ID 468). Regardless, however, the ALJ articulated serious concerns about the treating source opinion's inconsistencies both internally and with the record as a whole. I suggest that this, and the evidence that the ALJ considered the required factors as to both treating physicians, is sufficient. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("Thus the procedural rule is not a procrustean bed, requiring an

19

arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

As a final matter, Plaintiff seems to suggest that the ALJ erred solely by virtue of giving more weight to the state consultants' opinions than to the treating source's opinion. (Doc. 13 at ID 457). But 20 C.F.R. 404.1527(c)(1) provides only that "*generally more weight will be given to the opinion of an examining source*" than other sources. 20 C.F.R. § 404.1527 (emphasis added). It does not prohibit an ALJ from ever assigning more weight to another source. In fact, Social Security Ruling 96-6p explicitly contemplates that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or medical sources." SSR 96-6p.[1] Such is the case here, for the reasons the ALJ articulated.

Plaintiff is especially concerned that the state agency consultants rendered their opinions before "important EMG testing was performed which confirmed peripheral neuropathy." (Doc. 13 at ID 452). But "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011). The ALJ's analysis of Plaintiff's alleged bilateral peripheral neuropathy is discussed further below.

---

[1] SSR 96-6p has since been rescinded and replaced by SSR 17-2p, but SSR 96-6p was still in effect through the date of the Commissioner's final decision in this case.

20

In sum, I suggest that the ALJ provided good reasons for not giving compelling weight to the treating physician's opinion.

### 2. The ALJ's analysis of Plaintiff's bilateral peripheral neuropathy

Next, Plaintiff argues the ALJ erred by failing to properly explain why his bilateral peripheral neuropathy was not a severe impairment. (Doc. 13 at ID 458). An impairment is severe if it "significantly limits" the claimant's ability to do basic work activities. See 20 C.F.R. § 416.921; SSR 96-3p. It is the claimant's burden to show his impairment is severe and meets the durational requirements of the Social Security Act. *See Harley v. Comm'r Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). Here, the question for the court is whether substantial evidence supports the ALJ's evaluation that Plaintiff's bilateral peripheral neuropathy did not rise to the level of a severe impairment. *See Cutlip*, 25 F.3d at 286 (If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion.").

Plaintiff goes too far in claiming that "[n]owhere in the hearing decision does the ALJ . . . acknowledge that the EMG did in fact confirm peripheral neuropathy." (Doc. 13 at ID 459). To the contrary, the ALJ lays out that on January 21, 2014, Plaintiff underwent an EMG and nerve conduction study on his bilateral lower extremities; the nerve conduction study "showed evidence of mild bilateral peripheral neuropathy with a differential of mild chronic lumbosacral radiculopathy," while the EMG of the left lower extremity and lumbar paraspinals was normal. (Tr. 16) (citing Tr. 298).

And while the ALJ acknowledged Plaintiff's testimony that neuropathy made his joints ache and his feet burn, he also discussed record evidence suggesting Plaintiff's impairment was not severe. (Tr. 16–17). For example, the ALJ pointed out that although in August 2013, Plaintiff "was found to have decreased sensation in his bilateral upper and bilateral lower extremities," "no such findings were documented in follow-up treatment notes." (Tr. 16). At his administrative hearing, Plaintiff denied having any problems with his hands or arms. (Tr. 46). Additionally, the ALJ noted that the January 2014 nerve conduction study ("EMG") showed "only mild neuropathy" in his bilateral lower extremities, (Tr. 298), and Plaintiff "consistently denied having any functional problems." (Tr. 297, 318, 322, 326). He "consistently reported that his pain needs were being met, and treatment records from his pain management provider show that his medications improved his functioning and quality of life." *See* (Tr. 330, 350, 356, 359, 372, 379, 386, 392, 398). The ALJ remarked on how the treatment records and Plaintiff's consistently mild pain ratings "do not support the claimant's allegation that his pain is unbearable." (Tr. 17). Plaintiff's physicians repeatedly advised him to engage in daily activities, *e.g.*, (Tr. 313, 334, 342, 351, 357, 363, 372, 380), and he reported to his pain management provider that his medication regimen allowed for all activities of daily life. (Tr. 330). As the ALJ noted, this "does not support his contention that doing a task for just one hour a day would cause him to be in pain the rest of the day." (Tr. 17).

Further, the treating source's statement did not attribute any of Plaintiff's limitations to peripheral neuropathy, but described the only "medical findings" supporting his suggested limitations as COPD and "FEV1 40." (Tr. 327–29). *See Seeley*

22

*v. Comm'r of Soc. Sec.*, 600 F. App'x 387, 390 (6th Cir. 2015) ("When doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment.") (quoting *Long v. Apfel*, 1 F. App'x 326, 331 (6th Cir. 2001)).

Still, Plaintiff asserts that even if the ALJ properly found Plaintiff's peripheral neuropathy to be not severe, the ALJ failed to comply with SSR 96-8p. (Doc. 13 at ID 459). SSR 96-8p requires an ALJ to consider even "non-severe" impairments in determining a claimant's RFC. I suggest it is sufficient that the ALJ discussed the evidence relating to Plaintiff's peripheral neuropathy and acknowledged that in assessing Plaintiff's RFC, he "must consider all of the claimant's impairments, including impairments that are not severe." (Tr. 12). *See Simons v. Barnhart*, 114 F. App'x 727, 734 (6th Cir. 2004) ("[j]ust because the ALJ did not separately discuss [the plaintiff's] multiple impairments does not mean he did not consider their combined effect.").

### 3.     The ALJ's assessment of Plaintiff's residual functional capacity

Lastly, Plaintiff argues that the ALJ failed to perform a function-by-function analysis of his RFC as required by SSR 96-8p. As the Sixth Circuit has recognized, however, while a "function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (citation omitted). Rather, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution

23

of any inconsistencies in the record." *Id.* (citation omitted); *see also Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013) (SSR 96-8p requires the ALJ to "address a claimant's exertional and nonexertional capacities and also describe how the evidence supports her conclusions.").

Here, Plaintiff's argument is not well-taken, as the ALJ discussed at some length the record evidence validating his conclusions. (Tr. 17). For instance, he relied on: Plaintiff's "largely unremarkable" physical examinations, (Tr. 276) (unremarkable except for decreased range of motion in hips and lumbar spine), (Tr. 281) (unremarkable except for tenderness at lumbar spine and decreased rotation), (Tr. 262–69) (normal gait, strength, and reflexes, and full range of motion), (Tr. 313) (unremarkable except for pain with range of motion testing); the state agency medical consultants' assessments (Tr. 51–61, 63–72); Plaintiff's normal EKG, (Tr. 292); his nerve conduction study showing evidence of only mild neuropathy in his lower extremities, (Tr. 298); his testimony that he had no problems with either of his hands or arms, (Tr. 46); his consistent denial of any functional problems, (Tr. 297, 318, 322, 326); the fact that he was "totally" not a surgical candidate, (Tr. 313); his low pain ratings at both Nashville General Hospital, (Tr. 306, 318, 326), and his pain management provider, (Tr. 330, 350, 356, 359, 372, 379, 386, 392, 398); his reports that his pain needs were being met, (Tr. 297, 306, 318, 322); his physicians' recurring advice to participate in daily activities, (Tr. 313, 334, 342, 351, 357, 363, 372, 380); his lack of emergency room visits for COPD symptoms, despite his testimony that he had daily coughing spells that almost made him pass out, (Tr. 33); that he continues to smoke a pack of cigarettes daily, (*id.*); and that records from his pain

24

management provider show he consistently denied any adverse side effects to his medications, contrary to his testimony that his medications made him tired, (Tr. 159); *cf.* (Tr. 330, 353, 359, 368, 376, 383, 388). Thus, I suggest the ALJ adequately explained the basis for his determination of Plaintiff's RFC.

Finally, Plaintiff asserts that his testimony and the treating source medical opinion supported several nonexertional limitations: a sit/stand option, a need to lie down, and multiple absences from work per month. (Doc. 13 at 461). As discussed previously, however, the ALJ provided good reasons for not giving greater weight to that evidence, and thus for not including Plaintiff's desired restrictions in his RFC. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155–56 (6th Cir. 2009) (ALJ need not include limitations in RFC that the ALJ does not find credible).

In conclusion, I suggest that the ALJ's decision was supported by substantial evidence.

## II.  RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 12), be **DENIED**.

## III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 12, 2018       S/ PATRICIA T. MORRIS
                PATRICIA T. MORRIS
                UNITED STATES MAGISTRATE JUDGE
                SITTING BY SPECIAL DESIGNATION